

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00174-CR
_____

PATRICIA LYNN FRAKE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 24-0319X

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

After the trial court denied Patricia Lynn Frake's motion to suppress, she pled guilty to the second-degree felony offense of possession of a controlled substance, methamphetamine, in an amount of four grams or more but less than two hundred grams, and was placed on community supervision. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102 (Supp.) ("Penalty Group 1"), § 481.115(d) (Supp.). On appeal, Frake argues that the officers did not have reasonable suspicion to detain her, and the ensuing canine sniff and search of her vehicle were unlawful. We affirm the trial court's judgment.

## I. Applicable Facts

At a hearing on Frake's motion to suppress, Lieutenant William Jones of the Harrison County Sheriff's Office (HCSO) was the sole witness. He testified that he and Deputy Garrett Bailey of the HCSO were on patrol on a Sunday afternoon in broad daylight when they observed a maroon Taurus sedan traveling on the interstate. The vehicle began intermittently slowing down, then speeding up, then changing lanes, causing eighteen-wheelers to go around it. A registration check showed that the vehicle was not registered in Harrison County, but it was registered nearby, such as the Gilmer or Gladewater area. The vehicle had not been reported stolen and was not associated with any outstanding warrants.

Jones and Bailey followed the vehicle as the driver exited the interstate and eventually turned onto a gravel-lease road off State Highway 43. Jones described the lease road as a rough gravel road not typically used by passenger vehicles, but instead, primarily used by heavier, off-road capable vehicles such as forestry equipment, oil-field trucks, pickup trucks, tanker trucks,

2

and other work vehicles. Jones pulled off the highway to observe whether the vehicle was turning around after a missed exit. The vehicle never left the lease road, so he and Bailey returned to where they last saw the vehicle. Jones testified that he did not observe a specific traffic violation before initiating contact with Frake. When Jones and Bailey approached the vehicle, the driver and sole occupant of the vehicle, Frake, "was outside of the vehicle on the driver's side of the vehicle close to the locked gate" that was less than one hundred feet from the highway. Jones parked the marked patrol unit on the lease road behind Frake's vehicle and engaged the unit's overhead flashing lights but did not initiate the unit's sirens. Jones then exited and approached Frake. Bailey exited the patrol unit and approached Jones while he was standing beside Frake's vehicle and Frake was standing at the gate. Bailey then stayed back closer to the patrol unit. Both officers were armed and in police uniform. Frake asked why she was being detained, and Bailey responded that she was not being detained for a traffic stop but that, after seeing a parked car at a locked gate, "[they] came out on a suspicious vehicle."

Jones asked Frake, "Can you open [the gate]" and "Would you mind me seeing [the key] open [it]?" Frake unsuccessfully attempted to open the gate. She stated the key "fits in there, but [she] ha[s] several keys." Frake told Jones that she had a key to the gate and that she was attempting to access her brother-in-law's property. Frake said her brother-in-law was Bruce Holland. Jones testified that she glanced at the gate, which had a sign showing "Mudd & Holland" owned the land. Jones advised that he was going to call Mr. Holland, and Frake responded, "Call him."

3

Jones called the property owner, Tim Holland, with whom he had had previous dealings. Jones testified that Holland denied knowing Frake and said that Frake did not have permission to access the property.

Jones testified that he did not see contraband in plain view in the vehicle and did not detect the odor of narcotics. However, Jones requested consent to search the vehicle, which Frake declined. Jones then conducted a canine free-air sniff of the vehicle, and the dog alerted. Thereafter, Jones and Bailey searched the vehicle and found a partially smoked marihuana cigar in the passenger seat and a suspected methamphetamine pipe in the ashtray. They also found narcotics in a luggage case in the back seat containing women's clothing and mail addressed to Frake. After transporting Frake to jail, Jones found additional narcotics in the backseat of the patrol unit where Frake had been seated, and Frake admitted to placing that contraband there.

The trial court denied Frake's motion to suppress. Neither party requested findings of fact and conclusions of law. At a later hearing, Frake pled guilty to the second-degree felony offense of possession of a controlled substance, methamphetamine, in an amount of four grams or more but less than two hundred grams, and was placed on community supervision. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102, .115(d).

Frake appeals. She asserts that "[f]rom the outset, the interaction between officers and [herself] was an investigative detention, not a consensual encounter, thus triggering Fourth Amendment[1] protections." Frake further asserts that "[m]oreover, even if the officers had reasonable suspicion at the outset of the detention regarding a potential criminal trespass, they

---

[1] *See* U.S. CONST. amend. IV.

4

exceeded the scope of that detention when they sought to search the car for narcotics, for which they did not have reasonable suspicion."

## II.     No Abuse of Discretion in Denying Motion to Suppress

In Frake's sole point of error, she argues that the trial court abused its discretion by denying her motion to suppress because it was not a consensual encounter and the officers did not have reasonable suspicion.

### A.     Standard Of Review

"A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion." *Irsan v. State*, 708 S.W.3d 584, 609 (Tex. Crim. App. 2025) (quoting *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). "When reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review." *Ochoa v. State*, 707 S.W.3d 344, 360 (Tex. Crim. App. 2024). "The trial court is the sole trier of fact and judge of the witnesses' credibility and weight to be afforded their testimony." *Id.* "Accordingly, we defer almost totally to a trial court's determinations of historical fact, so long as such determinations are supported by the record, as well as to its rulings on mixed questions of law and fact that hinge on credibility and demeanor." *Id.* "We, however, review *de novo* the trial court's rulings on pure questions of law or mixed questions of law and fact that do not hinge on credibility or demeanor." *Id.* "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *Id.* (quoting *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023)). "The trial court's ruling on a motion to suppress will

be reversed only if it is arbitrary, unreasonable, or outside the zone of reasonable disagreement." *State v. Heath*, 696 S.W.3d 677, 689 (Tex. Crim. App. 2024).

Where, as here, the trial court did not make findings of fact and conclusions of law, we "assume the trial court made implicit findings of fact in support of the ruling as long as those implicit findings are supported by the record." *Burton v. State*, 339 S.W.3d 349, 358 (Tex. App.—Texarkana 2011, no pet.); *see Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). "When there are no written findings from the trial court, we may infer the necessary findings that would support the trial court's ruling if the record (viewed in light most favorable to the ruling) supports these implied fact findings." *Ochoa*, 707 S.W.3d at 360 (citing *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013)).

### B.    Applicable Law

"The law has recognized three types of police-citizen interactions related to searches and seizures:  (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that must be supported by a reasonable suspicion of criminal activity; and (3) arrests that are reasonable only if supported by probable cause." *Monjaras v. State*, 664 S.W.3d 921, 927 (Tex. Crim. App. 2022).

To determine whether the interaction was an encounter or an investigatory detention, we must determine whether a seizure occurred in this case.  A seizure of the person occurs when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen" and the citizen has submitted to that authority.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)); *see State v. Castleberry*,

332 S.W.3d 460, 466–67 (Tex. Crim. App. 2011). Such a determination is made based on the totality of the circumstances surrounding the event. *Bostick*, 501 U.S. at 439; *Castleberry*, 332 S.W.3d at 467. The crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he/she was not at liberty to ignore the police presence and go about his or her business. *Bostick*, 501 U.S. at 439; *Castleberry*, 332 S.W.3d at 467.

"An encounter is consensual only if the citizen is free to leave and terminate the interaction at any time." *Monjaras*, 664 S.W.3d at 927 (citing *Johnson*, 414 S.W.3d at 193). "An encounter is a detention if an officer, through a showing of force or authority, restrains a citizen to the point that an objectively reasonable person would not feel free to decline the officer's requests or terminate the encounter." *Id.* "There is no bright-line rule dictating when a consensual encounter becomes a detention." *Id.* (quoting *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016)). "A consensual encounter will not escalate into an investigative detention solely because an officer asks a citizen for identification and permission to search." *Id.* "Nor will a consensual encounter become an investigative detention merely because an officer fails to inform the citizen that he does not have to comply with the requests." *Id.* (citing *Castleberry*, 332 S.W.3d at 466). "However, an investigative detention does occur if the officer conveys to the citizen that compliance with the requests is required." *Id.* (citing *Bostick*, 501 U.S. at 429, 434–35; *Castleberry*, 332 S.W.3d at 467).

> Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or *the use of language or tone of voice* indicating that compliance with the officer's request might be compelled.

*Crain*, 315 S.W.3d at 49–50 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The time, place, and surrounding circumstances must be taken into account, but the officer's conduct is the most important factor in determining whether a police-citizen interaction is a consensual encounter or a Fourth Amendment seizure." *Castleberry*, 332 S.W.3d at 467 (citing *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)).

"[R]eviewing courts must 'examine the totality of the circumstances to determine whether a reasonable person would have felt free to ignore the officer's request or to terminate the consensual encounter.'" *Monjaras*, 664 S.W.3d at 927 (quoting *Furr*, 499 S.W.3d at 877). "Each citizen-police encounter must be factually evaluated on its own terms; there are no *per se* rules." *Garcia-Cantu*, 253 S.W.3d at 243 (citing *Bostick*, 501 U.S. at 440). "[I]n determining whether a reasonable person would have felt free to leave, we look at the officer's conduct as well as the setting in which the police-citizen interaction takes place." *Crain*, 315 S.W.3d at 51 (footnote omitted) (citations omitted). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Garcia-Cantu*, 253 S.W.3d at 243–44 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

## C.     Initial Interaction Was a Consensual Encounter

The threshold question is whether Frake was seized from the moment the officers approached her or whether the initial interaction was a consensual encounter. Because the trial court viewed the body-camera footage and denied Frake's motion to suppress without entering findings of fact, we must view the evidence in the light most favorable to the ruling and assume the trial court made all implicit findings supported by the record. *See Heath*, 696 S.W.3d at 689.

The record contains no evidence that Frake yielded to any display of authority. *See Castleberry*, 332 S.W.3d at 467 ("[W]hen a suspect fails to yield to a show of physical force and there has been no actual use of physical force, then there is no seizure." (citing *Hodari D.*, 499 U.S. at 621)). Jones and Bailey did not stop Frake's vehicle. When they arrived on the lease road, Frake's vehicle was already parked near a locked gate, and Frake was standing outside the vehicle. Jones pulled in behind the vehicle and activated the unit's lights.[2] The trial court could reasonably infer that the lights were activated for officer safety near the highway. *Martin v. State*, 104 S.W.3d 298, 301 (Tex. App.—El Paso 2003, no pet.) ("Under such circumstances, depending on the facts, the officers may well activate their emergency lights for reasons of highway safety or so as not to unduly alarm the stopped motorists." (quoting *State v. Baldonado*, 847 P.2d 751, 754 (N.M. Ct. App. 1992))).

After he parked the patrol unit, Jones exited the unit and walked toward Frake's vehicle. *See Monjaras*, 664 S.W.3d at 928–29 (concluding "that officers approached Appellant around midday in a public location using a tone that was not overtly hostile," without brandishing

---

[2]Jones did not activate the unit's siren.

9

weapons, was a consensual encounter even if an objectively reasonable person would have been uncomfortable). Bailey initially stayed in the patrol unit. No weapons were drawn. No commands to stop, remain, or comply were issued. *See Florida v. Royer*, 460 U.S. 491, 497–98 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking h[er] if [s]he is willing to answer some questions, by putting questions to h[er] if the person is willing to listen, or by offering in evidence in a criminal prosecution h[er] voluntary answers to such questions."). Frake answered Jones's questions and attempted to produce a gate key. *See Castleberry*, 332 S.W.3d at 466 ("[T]he fact that the citizen complied with the [officer's] request does not negate the consensual nature of the encounter." (citing *Immigr. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216 (1984))).

Frake's vehicle was pointed toward the gate and away from the patrol unit. That means the patrol unit did not block the direction she appeared to be heading. *See Garcia-Cantu*, 253 S.W.3d at 246 n. 44 ("[W]hen an officer only partially blocks a parked car or merely makes it somewhat inconvenient for the citizen to depart voluntarily, such action is not necessarily, by itself, sufficient to constitute a Fourth Amendment detention."). Even if she wanted to turn around, Jones testified that there was room on the lease road for Frake to back up, turn around, and go around the patrol unit if she had wished to leave, and she never indicated that she could not get by or requested they move the patrol unit. The trial court was entitled to credit Jones's testimony that Frake could have driven around the patrol unit on the lease road if she had wanted to leave and that he did not intend to "block[] her" in.

10

Even though "[t]his interaction would arguably make an objectively reasonable person uncomfortable; however, this alone is not enough under our law to evidence more than a consensual encounter." *Monjaras*, 664 S.W.3d at 929. The trial court could have reasonably concluded that a person in Frake's position could have understood that she could choose to leave. *See Garcia-Cantu*, 253 S.W.3d at 243–47. Considering the totality of the circumstances, the initial interaction between Frake and the officers did not involve a seizure and was merely a consensual encounter.

There is a zone of reasonable disagreement here. Was Frake detained? Or was she trying to convince officers that she was innocently trying to get through a locked gate, to which, it turned out, she did not have the key? We do not know what would have happened if Frake had continued on the interstate without actually committing a traffic violation. Frake chose to exit the interstate, turn onto a rural State highway, and from there, in a sedan, turn onto a gated-lease road typically used by larger vehicles. Frake then chose to get out of the vehicle and stand by the gate in a manner that gave the appearance of someone trying to open it. Frake also chose to stay there, without either opening the gate or leaving the area. All those choices by Frake preceded Jones and Bailey pulling up behind her. Jones testified that he thought Frake was perhaps thinking, "I [will] kind of hide for a minute, and when the cops have gone, I'll continue on my merry way, and they won't see me[.]"

The law regarding consensual encounters takes as a given that there will sometimes be interactions between law enforcement and the public. *See Monjaras*, 664 S.W.3d at 927. As set forth above, under the abuse of discretion review, we review trial court rulings about such

11

interactions considering the facts and reasonable inferences therefrom in the light favorable to the trial court's ruling. In this instance, we do so without the hindsight of the eventual discovery of drugs and drug paraphernalia. Instead, we look through the abuse of discretion lens at what the trial court could have reasonably believed about how a reasonable person in Frake's position would have perceived the encounter as it was developing. *See id.* at 932. Developments kept turning against Frake with each new piece of information, but she chose to provide that information. Jones testified that Frake "could have proceeded if she could have opened the gate." But Frake could not open the gate, so she chose to make the claim that she knew the owner of the property behind the gate. The trial court could have reasonably believed that Frake was acting out of the belief that she could say something that would prompt Jones and Bailey to move on. Perhaps they would have if Frake had known the landowner, and although she forgot the key, she had permission. Perhaps Frake would have gone on her way if the dog had not alerted during the free-air sniff.[3] Immediately prior to the free-air dog sniff, Frake had denied consent for the officers to search the vehicle but had granted permission for the officers to search her personal effects. The trial court heard from Jones live on the stand, and came to the conclusion that all of these events, including the free-air dog sniff, were a consensual encounter. In the totality of the circumstances, we defer to the trial court's assessment. Viewing the record

---

[3]The post-sniff search of Frake's vehicle was not consensual, but that was the result of intervening events. As stated by Frake, "Jones asked [her] for consent to search the car. And when she declined consent, Jones deployed the canine unit." Frake described that as a "free-air sniff of the car." "[T]he canine positively alerted for the odor of narcotics in the car." "During the subsequent search of the car, officers found methamphetamine in a suitcase in the backseat." A free-air sniff can become a search subject to Fourth Amendment protections if a dog intrudes into the vehicle. *State v. Organ*, 726 S.W.3d 346, 364 (Tex. Crim. App. 2025) ("The intrusion into the protected area occurred during the open-air sniff, which was done to obtain information, and law enforcement used the information obtained immediately thereafter to establish probable cause to search the vehicle."). But Frake made no such argument.

in the light most favorable to the ruling, the trial court's denial of Frake's motion to suppress was not an abuse of discretion.

We overrule Frake's sole issue.

## III.    Conclusion

We affirm the trial court's judgment.


Jeff Rambin
Justice

Date Submitted:      June 4, 2026
Date Decided:        August 5, 2026

Do Not Publish